

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00271-CV

———————————————

IN THE INTEREST OF T.E., A MINOR CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-737023-23

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Father challenges the trial court's order terminating his parental rights to his child, T.E.[1] In his sole issue on appeal, Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination is in T.E.'s best interest. Because legally and factually sufficient evidence supports the trial court's best-interest finding, we affirm.

## I. Background

The Texas Department of Family and Protective Services (TDFPS) became involved with T.E.'s family the day T.E. was born.

### A. TDFPS's Investigation

TDFPS received an intake asserting that Mother[2] had tested positive for amphetamines when she gave birth to T.E., who subsequently tested positive for both amphetamines and methamphetamine. Mother admitted that she drank alcohol throughout her pregnancy and that she smoked marijuana, and she was "surprised" that she had not tested positive for marijuana. Mother denied using methamphetamine, instead claiming that she had tested positive because the person she was sleeping with used methamphetamine. She did not specify whether she was

---

[1]To protect his identity, we refer to T.E. by his initials and to his family members by aliases. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The trial court also terminated Mother's parental rights to T.E., but she did not appeal.

referring to Father, who she asserted was her "common-law" husband and with whom she had been living.

Johanna Ward, the TDFPS investigator on T.E.'s case, later questioned Mother while Father was present, and Mother then denied any drug use. She claimed that she had been handling and packaging methamphetamine for "a friend" because she needed the money and that she had done so just days before giving birth to T.E.

Father asserted that he had not been aware of Mother's involvement with methamphetamine and that he learned of it only after hospital staff discussed her drug-test results with them. When asked about his own drug use, Father asserted that he did not handle or use any drugs. Ward then asked Father to take a drug test, and when he agreed, he admitted that he had recently smoked marijuana. He tested positive for marijuana, amphetamine, and methamphetamine.

Ward questioned Father about his criminal history, and he denied having any. Ward then questioned Mother privately, and she disclosed that Father had been arrested for assaulting her in May 2023, when she was thirty-two weeks pregnant with T.E. She explained that Father had been drinking, that he became angry, and that he kicked a door, but she denied that he had been violent toward her. The police report from the incident, however, specified that Father had hit and strangled Mother. Mother had told the police that Father's face looked "evil" and that she was frightened for herself and for her unborn baby. Following Father's arrest, the arresting officer requested an emergency protective order on Mother's behalf, which was

granted against Father. Father was indicted for the offense of assault of a pregnant person, a third-degree felony, and he ultimately pled guilty as part of a plea bargain.

Based on Mother's history with Child Protective Services (CPS),[3] Mother's and Father's drug use, and Father's failure to be "forthcoming with [TDFPS] about his knowledge of [Mother's] substance abuse or his criminal arrest regarding domestic violence," TDFPS determined that moving forward with removal was in T.E.'s best interest.

### B. Father's Service Plan

TDFPS developed a service plan for Father, and he agreed to work on his services. To comply with his service plan, Father was required to provide proof of safe, stable housing and employment; attend parenting classes; complete a domestic violence assessment; abstain from criminal activity; submit to monthly drug testing and provide negative drug-test results; participate in and complete substance-abuse treatment; complete a Battering Intervention and Prevention Program (BIPP); complete a psychological and MHMR assessment; and attend counseling. Of these requirements, Father successfully completed only the required parenting classes. At the time of trial, he was still engaged in individual counseling and substance-abuse counseling, he had tested positive for drug use throughout the case, and he had restarted his BIPP classes due to a domestic-violence incident with Mother in

---

[3]Mother had an "extensive history" with CPS. She had previously lost custody of each of her older biological children, and she had been noncompliant with previous safety plans and court-ordered services through TDFPS.

February 2024. This incident added anger management treatment to his service plan, which he had not completed.

The permanency specialist for T.E.'s family, Lauren Bradshaw, testified that Father's issues had more to do with his sobriety efforts than with his engagement of services. According to Bradshaw, even if Father had been given more time to complete his services and had stayed away from Mother, he still would not have successfully completed his service plan. In addition to Father's inability to complete his BIPP course and to provide negative drug-test results, his ability to provide T.E. with a safe, stable environment and housing had been an issue. Moreover, Father never cut off communication with Mother, nor did he have any intention of doing so. Father had expressed to Bradshaw that he and Mother were "working on their family" and that he wanted his "entire" family back. Bradshaw opined that returning T.E. to Father's care would not be in T.E.'s best interest.

## C. Father's Drug Use

Father was required to stay clean and sober and to attend drug-counseling sessions. Monica Kwiatkowski, the licensed chemical-dependency counselor who treated him, testified that when Father first began treatment, he was not honest about his use of methamphetamine and cocaine. Father eventually admitted that he was a "daily user" and that he regularly drank alcohol. He also stated that he had used methamphetamine with Mother.

Kwiatkowski described Father's treatment progress as a cycle: "[h]e would make progress, and then he would slip, and then he would make progress, and then he would slip again." Indeed, Father's drug use continued throughout the pendency of this case. On July 24, 2023, Father tested positive for marijuana and methamphetamine. On August 30, 2023, he tested positive for marijuana. On January 23, 2024, he again tested positive for methamphetamine and marijuana. On February 28, 2024, he tested positive for cocaine. On April 26, 2024, he tested positive for cocaine and methamphetamine. Kwiatkowski estimated—based on her last conversation with Father—that his last drug use had been in May 2024, the month before trial.

At the time of trial, Father had not been successfully discharged from his dependency treatment. Kwiatkowski opined that Father did not have long-term or stable sobriety. According to Kwiatkowski, Mother was a "big trigger" for Father, especially emotionally, and she did not believe that Father would stay away from Mother "[b]ecause he loves her and that[ is] all he knows."

**D. Post-Removal Domestic Violence**

On February 25, 2024, Fort Worth Police Officer Juan Castro was dispatched to Mother's apartment[4] regarding a domestic disturbance. Mother reported that she had asked Father to come over, that they had argued, and that Father had broken her

---

[4]Mother claimed that Father moved out of their shared apartment in September 2023. Father, however, maintained that they had continued to live together.

phone when she tried to call the police, had dragged her by her hair into the apartment, and had assaulted her. Mother asserted that she had been able to get away from Father because he had "headbutt[ed] the wall" until he knocked himself out. Father denied Mother's allegations and claimed that she had hit him in the head with a dining-room chair. Based on Mother's and Father's statements to police, investigators determined that there was not enough evidence to "substantiate an assault" charge against Father. Instead, Father was charged with interfering with an emergency call.

Kwiatkowski testified that she had been on the phone with Mother and Father the night of the February 25, 2024 incident, and during the phone call, she "tried to mediate" between them. While Father had initially claimed that Mother hit him with a chair, he later admitted to Kwiatkowski that this was not true. Kwiatkowski testified that Father had been in a "blackout rage" and that Mother had been terrified.

Bradshaw testified that the domestic violence displayed by Father placed T.E. in "great danger" and that Mother's allowing Father into her home created an unsafe, unstable environment that is not ideal for a child. Bradshaw also opined that Mother and Father were "codependent" and would not stay away from each other.

**E. Termination**

A bench trial was held on June 10, 2024. Father was not present at the termination trial. According to his trial counsel, Father had been arrested about two

weeks before trial. Father's counsel did not clarify whether Father's incarceration was the reason for his absence from trial.[5]

Based on the evidence before it, the trial court terminated Father's parental rights to T.E. In its termination order, the trial court found that Father had (1) knowingly placed or knowingly allowed T.E. to remain in conditions or surroundings that endangered his physical or emotional well-being; (2) engaged in conduct or knowingly placed T.E. with persons who engaged in conduct that endangered his physical or emotional well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of T.E.; and (4) used a controlled substance in a manner that endangered T.E.'s health or safety and either failed to complete a court-ordered substance-abuse treatment program or, after completion of a court-ordered substance-abuse treatment program, continued to abuse a controlled substance. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P). The trial court also found that termination of the parent–child relationship between Father and T.E. is in T.E.'s best interest. *See id.* § 161.001(b)(2).

Father timely appealed.

---

[5]Father's counsel brought Father's incarceration to the trial court's attention in the context of a motion for continuance, which the trial court denied.

## II. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one of the predicate grounds listed in Subsection 161.001(b)(1)[6] and (2) that termination is in the child's best interest. *Id.* § 161.001(b);[7] *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding—here, the best-interest finding—to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed

---

[6]Father does not challenge the predicate-conduct grounds found by the trial court. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P).

[7]In his brief, Father also challenges the sufficiency of the evidence supporting "the trial court's finding pursuant to Texas Family Code Section . . . 161.003(a)(5)." But the trial court made no such finding; Father's parental rights to T.E. were not terminated under Section 161.003.

9

evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of Father's parental rights to T.E. is in T.E.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### III. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of a child's best interest may be the same evidence that is probative of the predicate grounds

under Subsection 161.001(b)(1). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## IV. Analysis

### A. T.E.'s Desires

At the time of trial, T.E. was approximately eleven months old. "Generally, when children are too young to express their desires, this factor is considered neutral." *In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *5 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (quoting *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g)). This factor weighs neither in favor of nor against the trial court's best-interest finding. *See id.*

### B. T.E.'s Emotional and Physical Needs and the Emotional and Physical Danger to T.E. Now and in the Future

A child's safety is key to the best-interest analysis, and "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *15 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). Here, Father demonstrated that he lacked the ability or willingness to provide for T.E.'s needs. The evidence of domestic violence and of Father's consistent drug use supports a finding that Father presented a danger to T.E. and that a home with Father would likely include drugs and domestic violence.

As part of a plea bargain, Father pleaded guilty to the third-degree felony offense of assaulting a pregnant person, based on the domestic-violence incident in May 2023. He did not disclose this arrest when questioned by TDFPS investigator

12

Ward. Then, in February 2024—after T.E. was born and after TDFPS had removed him from Mother and Father's care—Father committed another act of domestic violence against Mother in a "blackout rage." Permanency specialist Bradshaw testified that the domestic violence placed T.E. in "great danger" and that a home with Father would not be safe or stable. The trial court could have likewise concluded that the domestic violence constituted a danger to T.E., and it could have inferred that the domestic violence would likely continue. *See In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.)

As for Father's consistent drug use, he was a daily drug user and regularly drank alcohol. His history of drug use, including his use during the pendency of this suit despite knowing that his parental rights were in jeopardy, indicates that he will likely continue to use illegal drugs in the future. *See In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.) (noting that, as to future drug use, "a factfinder may measure a parent's future conduct by his past conduct"). This fact alone could constitute a danger to T.E. *See In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.); *see also In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) ("[A] child needs . . . parents who d[o] not use drugs.").

Further, Father knew that Mother had been using drugs, he admitted to using drugs with her, and he attacked her in a "blackout rage." Despite Mother's being a "big trigger" for Father, he would not stay away from her, and the trial court could have reasonably concluded that Father likely will not stay away from her in the future.

These factors weigh in favor of the trial court's best-interest finding.

**C. Father's Stability, Parental Abilities, and Plans for T.E.**

"[C]hildren need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). Just as Father's drug use and acts of domestic violence threatened T.E.'s safety, Father's behavior demonstrated a pattern that created instability and uncertainty. Additionally, Bradshaw testified that Father's ability to provide T.E. with a safe, stable environment and housing had been an issue.

Father also demonstrated an inability to parent. He continued to use drugs throughout the pendency of this case, he committed another act of domestic violence against Mother after T.E.'s removal, and he failed to complete his court-ordered services. Further, Father did not show up to the termination trial. *See In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *9–10 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) (affirming best-interest finding and noting that mother did not appear at trial). Father's actions conveyed the message that he was not interested in parenting T.E. *See id.* (noting that "[m]other's actions speak clearly: she has no intention of parenting [her child]").

Father did not identify his plans, if any, for T.E. *In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at *9 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.) (affirming best-interest finding and noting that the parent "did not put on any evidence of her plans").

These factors weigh in favor of the trial court's best-interest finding.

**D. Programs Available to Assist Father to Promote T.E.'s Best Interest**

Father failed to take advantage of the programs available to assist him. Despite a court order directing Father to complete his services, he failed to do so. While he did successfully complete his parenting classes, Father failed to provide proof of stable housing and employment, abstain from criminal activity, provide negative drug-test results, complete substance-abuse treatment, and complete his BIPP course. Not only did he have to restart his BIPP course, but he also had to add anger-management treatment to his service plan. Bradshaw opined that, even if Father had been given more time to complete his services, he would not have successfully done so.

The trial court could have concluded that any additional programs made available to Father would not benefit him. *See In re K.W.*, No. 02-24-00082-CV, 2024 WL 3461749, at *7 (Tex. App.—Fort Worth July 18, 2024, no pet.) (mem. op.). This factor weighs in favor of the trial court's best-interest finding.

**E. TDFPS's Stability and Plans for T.E.**

T.E. has spent his entire life in TDFPS's care. Since his removal, T.E. has been "thriving in all areas, meeting all of his milestones." He has not exhibited any medical

or dental concerns, and Bradshaw described him as a "happy baby." She testified that, if any concerns were to develop in the future, TDFPS would provide additional services to T.E.'s foster placement.

T.E. was initially placed with a foster family who was not adoption motivated. By the time of trial, however, the adoption agency had found an adoption-motivated placement, and TDFPS planned to place T.E. with that family if the trial court terminated Mother's and Father's parental rights to T.E.

These factors weigh in favor of the trial court's best-interest finding.

**F. Father's Acts or Omissions Indicating that the Parent–Child Relationship is Not Proper and His Excuses, if any, for the Acts or Omissions**

The evidence demonstrates that Father used drugs both before and after T.E. was born, that he continued to use drugs throughout the pendency of this case, that he brought domestic violence into the home while Mother was pregnant with T.E. and after T.E.'s removal, that he failed to complete his court-ordered services, that he refused to cut off contact with Mother, that he likely will continue to keep Mother in his life, and that he did not show up to the termination trial.

Father did not offer any excuses for his acts or omissions. These factors weigh in favor of the trial court's best-interest finding.

**G. Best-Interest Conclusion**

Stability and permanence are paramount to a child's upbringing. *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam). Father

16

cannot provide either. Indeed, the evidence shows that Father cannot provide T.E. a safe, stable, drug-free home.

Considering the evidence pertinent to each of the *Holley* factors, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent–child relationship between Father and T.E. is in T.E.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Z.N.*, 602 S.W.3d at 545; *C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Father's sole issue.

## V. Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: October 31, 2024